UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>(10) PATRICK O'HEARN,<br><br>Defendant | Crim. No. 21-cr-10208-NMGs |

### GOVERNMENT'S SUPPLEMENTAL RESPONSE TO DEFENDANT PATRICK O'HEARN'S MOTION TO SUPPRESS STATEMENTS

During the status conference conducted on September 14, 2023, the Court directed the government to file a supplemental brief in connection with defendant Patrick O'Hearn's pending motion to suppress, and to identify any evidence that the government obtained based on O'Hearn's post-arrest statements.

The government did not seize anything based solely on O'Hearn's statements. Following the arrest of O'Hearn and the lawful search of his apartment, the government sought and obtained a warrant for a TD Bank safe deposit box that belonged to O'Hearn (hereinafter, the "TD Bank Safe Deposit Box"). Though the affidavit in support of that warrant referenced a statement by O'Hearn confirming that he had a safe deposit box, the affidavit contained an independent basis for probable cause to search the TD Bank Safe Deposit Box. *See* Affidavit of FBI Special Agent Maria Classon in support of TD Bank Safe Deposit Box, 21-MJ-5356-JGD, dated July 14, 2023, which is attached hereto as Exhibit 1 (hereinafter, "TD Bank Affidavit"). Investigators seized $129,984[1] in cash that was in the TD Bank Safe Deposit Box. Regardless of any statements made

---

[1] The government's Opposition to the Motion to Suppress Statements incorrectly identified the seizure of $59,900 as the amount seized from the safe deposit box in question. That amount was seized from a different safe deposit box that O'Hearn did not identify during his post-arrest

1

by O'Hearn the discovery of that evidence was both inevitable and the result of an independent investigation. Moreover, O'Hearn's post-arrest statements were made knowingly and voluntary and anything seized based on those statements is admissible at trial. The Court should deny O'Hearn's motion.

## Factual Background

On July 8, 2021, investigators executed a search of O'Hearn's residence pursuant to a lawful search warrant.[2] During the search, investigators found multiple documents related to various financial institutions utilized by O'Hearn, including multiple deposit receipts that indicated he had an account at TD Bank. *See* Exhibit 2, Declaration of Auditor Lauren George (hereinafter, "George Declaration"), ¶ 10. After having received multiple Miranda warnings and executing a written waiver of rights, O'Hearn provided investigators with the combination of two safes.[3] Investigators opened the safes using the passwords provided by O'Hearn. Inside one of the safes, investigators located safe deposit box keys. When interviewed again, O'Hearn advised that one of the keys was for a safe deposit box at TD Bank; however, he provided incorrect information as to which branch the safe deposit box was located.

The financial records that investigators seized from O'Hearn's residence, identified banking activity by O'Hearn at multiple financial institutions, including TD Bank. *See* George

---

interview. As explained more fully herein, during the interview, O'Hearn referenced a safe deposit box that he used at TD Bank, though he provided investigators with the wrong bank location.

[2] O'Hearn filed a separate motion to suppress the evidence seized pursuant to that search warrant. *See* Dkt. 295. During the September 14, 2023 status conference, the Court verbally denied that motion.

[3] O'Hearn also provided the passwords to multiple electronics, however, the government does not anticipate introducing evidence from those electronics. Nor did the government take any further investigative actions or seize any evidence based on those electronics.

Declaration, ¶¶ 8-9. Over the next several days, based upon those financial records, the government caused grand jury subpoenas to be issued to those institutions seeking to identify accounts maintained by O'Hearn. Through the issuance of those grand jury subpoenas, investigators determined that safe deposit box #138 (the "TD Bank Safe Deposit Box") was leased in the name of Patrick O'Hearn at the TD Bank branch located at 12 Whiting Street, Hingham, MA 02184. On July 15, 2021, investigators subsequently executed a search warrant (No. 21-MJ-5356-JGD) of the TD Bank Safe Deposit Box and seized $129,984. The government intends to introduce evidence of this seizure in its case-in-chief in support of Counts 12 and 15 of the Superseding Indictment.

## Argument

As a threshold argument, the government notes that O'Hearn has failed to identify what evidence he believes to be fruit of the proverbial poisonous tree. For that reason, the Court should reject his motion. Regardless, introduction of this evidence does not trigger a constitutional concern because his statements were made knowingly and voluntarily, and the discovery of the evidence was inevitable and based on independent investigation.

*First*, as stated in the government's original response to O'Hearn's motion (ECF Dkt. 326), O'Hearn's statements made during the July 8, 2021 residential search were knowing and voluntary. O'Hearn was advised of his Miranda rights (more than once) and he knowingly waived those rights both verbally and *in writing*. See ECF Dkt. 326-2. Additionally, as the recording of O'Hearn's interview makes readily apparent, O'Hearn was cogent throughout the interview.[4] O'Hearn is college-educated and has a history of working in the financial industry. At the time of the

---

[4] A copy of the recorded interview was provided in automatic discovery to O'Hearn. Should the Court wish to review the recording, the government will provide a copy.

3

interview, O'Hearn was 62 years old.  O'Hearn explicitly informed investigators that he was willing to talk to them.  While providing truthful information in response to certain questions, O'Hearn, who has prior drug-related convictions, was less than forthcoming when it came to questions concerning his source of supply for methamphetamine, thus suggesting that O'Hearn's decision to talk was both knowing and voluntary.  At no time, did O'Hearn refuse to talk with the investigators.  Instead, he voluntarily provided them with the combinations for both safes and later talked to investigators about the keys that investigators located inside one of those safes.  Moreover, as reflected in the recording of O'Hearn's interview, the investigators were polite and solicitous of O'Hearn's well-being throughout.  Investigators paused when O'Hearn expressed feeling nauseous, and they took steps to ensure that the defendant's pet was going to be cared for. *See United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011) ("When charged with determining whether a confession was voluntary, an inquiring mind must sift through the totality of the circumstances, including both the nature of the police activity and the defendant's situation.").

As in *Hughes,* investigators were cordial throughout the interview, no threats were made, accommodations were offered to O'Hearn, and the interview was reasonable in length. *See id.* at 438-39.  Although O'Hearn (in his brief) contends that he was still under the influence of drugs during the interview, that fact (if true) is not determinative of the inquiry. *See United States v. Palmer*, 203 F.3d 55, 62 (1st Cir. 2000) (finding that the confession of defendant who was a heroin addict in withdrawal and under the influence of anti-depressants was voluntary where "[t]he officers appeared to be professional and there was no indication that the officers were rude, abrasive, or forceful."); *United States v. Diaz-Rosado*, 857 F.3d 116, 123 (1st Cir. 2017) (finding that defendant's contention that "his decision to speak was the result of a drug-addled state" did not render his confession involuntary where he did not claim that he was interrogated while he was

4

in custody or otherwise coerced). O'Hearn was coherent and understood the impact of his actions and statements. *See United States v. Holmes*, 632 F.2d 167, 168-69 (1st Cir. 1980) (finding that defendant's statements were voluntary where police officers testified that "although the defendant's breath revealed that he had been drinking,…they observed nothing in the defendant's demeanor to suggest that he did not understand what was going on or what he was doing."); *Doyon v. Robbins*, 322 F.2d 486, 491 (1st Cir. 1963) (finding that defendant's written confession was voluntary where the government's witnesses opined that defendant was "during his interrogation under the influence of intoxicating liquor but not intoxicated").

*Second*, even if O'Hearn had not spoken at all to investigators (or if his statements were to be suppressed), that would not have altered the course of the investigation – *i.e.*, investigators still would have obtained a search warrant for the TD Safe Deposit Box in due course. *See Nix v. Williams*, 467 U.S. 431, 444 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received."); *United States v. Zapata,* 18 F.3d 971, 978 (1st Cir. 1994) (application of the inevitable discovery rule requires that the government establish "(i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment.").[5]

Had investigators not obtained the safe combinations from O'Hearn, they would have forcibly opened the safes pursuant to the search warrant and seized the safe deposit keys. *See, e.g.,*

---

[5] "Although first applied in the Fourth Amendment context, the inevitable discovery doctrine applies with equal force to potential Fifth Amendment violations." *United States v. Hilton,* 625 Fed.Appx. 754, 759 (6th Cir. 2015); *accord United States v. Griffin,* 48 F.3d 1147, 1150 (10th Cir. 1995) (observing that "inevitable discovery doctrine allows the introduction of evidence acquired in violation of a defendant's Fourth, Fifth, or Sixth Amendment rights").

*United States v. Owens,* 2017 WL 151385, *2 (D. Mass. Jan. 13, 2017) (Burroughs, J.) ("There is no exception for locked containers" – police searching defendant's bedroom had the authority to pry open safes while looking for drugs, money, and records); *accord United States v. Wright,* 704 F.2d 420, 422-23 (8th Cir. 1983) (officers executing a search warrant for drugs were entitled to open residential safe as those items could fit in a safe and were reasonably expected to be found in the safe).[6]

O'Hearn's identification of the keys as being for a safe deposit box at TD Bank were, for all extents and purposes, immaterial to the investigation. In fact, O'Hearn provided investigators with false information regarding the bank branch at which the safe deposit box was located. Moreover, regardless of what O'Hearn told investigators about the keys, the normal practice of the auditor who conducted the financial investigation in this case was to review all seized financial records and identify the financial institutions where the subject of the investigation (in this case, O'Hearn) may have had an account. After identifying financial institutions, the auditor's practice was to cause grand jury subpoenas to issue to those institutions seeking production of various records relating to any accounts maintained at those institutions. The standard grand jury subpoena issued to such financial institution would require, *inter alia,* production of records relating to any safe deposit boxes that the subject of the investigation maintained at each institution. Such requests would be made regardless of whether investigators had any prior knowledge of the existence of a

---

[6] The search warrant affidavit for O'Hearn's residence explicitly discussed the fact that drug dealers used safes to hide evidence relating to drug trafficking and money laundering and sought authorization to search such safes. *See* Affidavit of FBI Special Agent Maria Classon, attached as Exhibit 1 to the Government's Opposition to Defendant's Motion to Suppress Evidence Seized Pursuant to Search Warrant (Dkt. 329-1), ¶ 44 ("I am also aware that drug traffickers generally try to hide cash and sensitive documents relating to their drug trafficking and money laundering in safes and other containers so that other individuals who are at their residence do not discover these materials.").

safe deposit box at a given financial institution. Then, based upon the evidence developed during the investigation, the government would seek search and seizures warrants to seize assets hidden in safe deposit boxes, as well as funds in identifiable accounts that had potentially been used in connection with the offenses being investigated. *See generally* George Declaration, ¶¶ 3-7.

The government followed this routine practice here. *See id.* During the search of O'Hearn's residence, investigators seized a large quantity of drugs, as well currency and jewelry believed to be related to his drug trafficking activities. *See* Exhibit 1, TD Bank Affidavit, ¶¶ 9-10. They also located multiple bank records, including deposit slips from TD Bank. Photos of those records were then provided to the auditor. *See* George Declaration, ¶ 8. Based upon the auditor's review of those records, the government caused grand jury subpoenas to be issued to TD Bank, as well as to numerous other financial institutions. *See id,* ¶ 9. Among other requests, the subpoenas to banks – including the subpoena to TD Bank – requested safe deposit box records ("<u>SAFE DEPOSIT RECORDS</u>: Including contracts, access records, records of rental fees paid, date paid and method of payment (cash or check), checks used to pay rental fee."). *See id.* The financial records that investigators obtained and subsequent financial analysis established that O'Hearn had accumulated excessive wealth, and that he maintained financial accounts at more than 25 different financial institutions. The investigation further revealed that he was a drug trafficker who had stored items of value in locked safes at his residence and that he was likely to store items of value, or other financial or drug-related records, in a safe deposit box. *See generally* Exhibit 1, TD Bank Affidavit, ¶¶ 9-13.

Thus, while O'Hearn's statement to investigators concerning the safe deposit box at TD

Bank may have expedited the identification of the financial institution,[7] investigators would have determined that O'Hearn was leasing the TD Bank Safe Deposit Box at the TD Bank's branch located at 12 Whiting Street, Hingham, MA and would have obtained a search warrant for the box.[8] *See generally* George Declaration; *see also United States v. Soto-Peguero,* 978 F.3d 13, 20 (1st Cir. 2020) (upholding search warrant under inevitable discovery doctrine where government established that absent unconstitutional search, "the officers inevitably would have applied for a warrant, obtained it, and discovered the evidence in question when executing the warrant."); *United States v. Zapata,* 18 F.3d 971, 978 (1st Cir. 1994) (holding that even if defendant's consent to search was tainted, officers surely would have impounded vehicle and, "in accordance with standard practice, conducted a routine inventory search" during which drugs would have been discovered); *United States v. Sweeney,* 2023 WL 4628178, *3 (D. Mass. July 19, 2023) (Burroughs, J.) (applying inevitable discovery doctrine where facts established that there were lawful independent means for discovering the evidence in question that investigators would have necessarily employed and that discovery was, in fact, inevitable).

For similar reasons, the seizure of assets from the TD Bank Safe Deposit Box is also admissible under the independent source doctrine. *See Murray v. United States,* 487 U.S. 533, 537

---

[7] The grand jury subpoena was served on TD Bank on July 9, 2021. The auditor requested an expedited subpoena return from TD Bank, specifically with respect to information pertaining to a safe deposit box. The TD Bank subpoena processing department responded the same day, and advised that Patrick O'Hearn was the current owner of safe deposit box #138 located in Hingham, MA (the "TD Bank Safe Deposit Box"). *See* George Declaration, ¶ 11.

[8] That this was the normal process undertaken by investigators is corroborated by the fact that, in September 2021, investigators subsequently sought and a search warrant for a safe deposit box O'Hearn maintained at South Shore Bank. Investigators only identified after issuing a grand jury subpoena to the institution after reviewing seized records. *See* George Declaration, ¶ 13. O'Hearn did not make any statements to investigators regarding the South Shore Bank safe deposit box.

(1988). That is, the only thing that O'Hearn said during the interview about the safe deposit key was that it was for a box at TD Bank; and he provided the wrong bank branch. The government through its independent financial investigation later identified the correct branch, and ultimately the box at issue, via grand jury subpoenas. As stated above, those subpoenas would have been issued to TD Bank regardless of O'Hearn's statements. As demonstrated by the supporting affidavit for the TD Bank Safe Deposit Box ("Exhibit 1, TD Bank Affidavit"), records produced by TD Bank established that O'Hearn maintained the TD Safe Deposit Box at the TD Bank in Hingham, Massachusetts. O'Hearn's statement that he maintained a safe deposit box with TD Bank (while mentioned in the TD Bank Affidavit) added nothing to the probable cause analysis.

Finally, where, as here, investigators were respectful of O'Hearn's rights during the residential search, repeatedly advised him of his Miranda rights, and obtained a signed waiver, application of the inevitable discovery doctrine does not create an untoward risk of future law enforcement misconduct. *Cf. Zapata,* 18 F.3d at 978 (courts must ensure that "application of the [inevitable discovery] doctrine… will not sully the prophylaxis of the [defendant's constitutional rights]").

## CONCLUSION

For all the reasons stated herein, the Court should deny O'Hearn's Motion to Suppress Statements.

DATED: October 5, 2023               Respectfully submitted,

                                     JOSHUA S. LEVY
                                     Acting United States Attorney

                         By:         */s/ Alathea E. Porter*
                                     Alathea E. Porter
                                     James E. Arnold
                                     Assistant U.S. Attorneys

9

**CERTIFICATE OF SERVICE**

      I hereby certify that on October 5, 2023, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                          */s/ Alathea E. Porter*
                                          Alathea E. Porter
                                          Assistant U.S. Attorney